# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Kimberly B., | Case No. 17-cv-5211 (HB) |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill, Acting Commissioner of Social Security, | |
| Defendant. | |

HILDY BOWBEER, United States Magistrate Judge[1]

     Pursuant to 42 U.S.C. § 405(g), Plaintiff Kimberly B. seeks judicial review of a final decision by the Acting Commissioner of Social Security denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The case is before the Court on the parties' cross-motions for summary judgment [Doc. Nos. 16, 19]. For the reasons set forth below, the Court denies Plaintiff's motion for summary judgment and grants the Commissioner's motion for summary judgment.

## I. Procedural Background

     Plaintiff filed applications for DIB and SSI on September 11, 2012, alleging she was not able to work as of August 31, 2009, due to osteoarthritis, affective/mood disorders, and related impairments. (R. 188–89, 396–408.) [2] Her applications were

---

[1] The parties have consented to have a United States Magistrate Judge conduct all proceedings in this case, including the entry of final judgment.

[2] The Social Security Administrative Record ("R.") is available at Doc. No. 10.

denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). The hearing was convened on May 14, 2014. (R. 107–32). The ALJ found Plaintiff not disabled in a written decision dated June 12, 2014. (R. 226–41.) Plaintiff requested review of the ALJ's decision, and the Appeals Council granted review and remanded the matter for a new hearing and decision. (R. 247–52.)

A second hearing was held before the same ALJ on June 14, 2016. (R. 74–106.) During the hearing, Plaintiff amended her onset date to July 17, 2012. (R. 105.) The new date corresponded with a previously issued unfavorable decision on a prior application for DIB. (R. 12, 133–46.)

In a decision dated August 8, 2016, the ALJ again found Plaintiff not disabled. (Tr. 8–35.) Pursuant to the five-step sequential evaluation procedure outlined in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since July 18, 2013. (R. 14.) At step two, the ALJ determined that Plaintiff had severe impairments of "bilateral carpal tunnel syndrome; facet osteoarthrosis in the lower lumbar region; fibromyalgia; major depression; mild sleep apnea; minimal osteophyte formation about the bilateral patellas; obesity; peripheral neuropathy in the lower extremities; polysubstance use, remission; and posttraumatic stress disorder." (R. 14.) The ALJ found at the third step that no impairment or combination of impairments met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1. (R. 15.)

At step four, the ALJ determined that Plaintiff retained the residual functional

capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except no more than occasional "kneeling, crouching, and crawling or bending; no more than occasional power gripping; and precluded from working on ladders or ropes or balancing activities in those kinds of things." (R. 18.) In addition, Plaintiff would require "a sit/stand option . . . ; no more than occasional use of ramps or stairs; no more than occasional stooping; no exposure to vibrations that are extreme; no exposure to hazards"; and walking "50 feet at a time at most and then being able to use a cane or a walker, and no walking on uneven surfaces." (R. 18.) Further, Plaintiff would be "restricted to essentially routine, repetitive 3–4 step tasks with corresponding stressors"; would be restricted to "no more than brief, superficial contact with others"; and would require "reasonably supportive supervision." (R. 18.) With this RFC, the ALJ concluded that Plaintiff could perform her past relevant work as a medical assembler. (R. 34.) Therefore, the ALJ found Plaintiff was not disabled.

Plaintiff requested review of the decision, which the Appeals Council denied. (R. 1.) The ALJ's decision thus became the final decision of the Commissioner. (R. 1.) Plaintiff then commenced this action for judicial review. She contends the ALJ failed to properly weigh the medical opinion evidence and failed to fully credit her testimony about the intensity, persistence, and limiting effects of her symptoms. (Pl.'s Mem. Supp.

---

[3] An RFC assessment measures the most a person can do, despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must base the RFC "on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

Mot. Summ. J. at 25, 34 [Doc. No. 17].)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). The claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability, not just the impairment, must have lasted or be expected to last at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III. Discussion

### A. The ALJ's Evaluation of Plaintiff's Symptoms

Plaintiff argues the ALJ erred in evaluating the intensity, persistence, and limiting effects of her symptoms.

#### 1. Legal Standards

It is well-established that an ALJ must consider several factors in evaluating a claimant's subjective symptoms, in addition to whether the symptoms are consistent with the objective medical evidence. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016). Those factors include daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *Polaski*, 739 F.2d at 1322; SSR 16-3p, 2016 WL 1119029, at *5. But the ALJ need not explicitly discuss each factor, *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005), and a court should defer to the ALJ's findings when the ALJ expressly discredits the claimant and provides good reasons for doing so, *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

#### 2. The ALJ's Consideration of Plaintiff's Symptoms

The ALJ's nine-page evaluation of Plaintiff's subjective complaints is one of the

most comprehensive this Court has reviewed.  The ALJ considered Plaintiff's complaints of constant pain in her back, knees, and shoulders; asserted limitation that she cannot walk without an assistive device; claim that she requires more than four hours of personal care attendant ("PCA") services per day due to weak muscles, carpal tunnel syndrome, and pain; complaint that anxiety and depression adversely affect her concentration, mood, sleep, appetite, and social life; and statement that prescribed medications caused drowsiness, dry mouth, insomnia, nervousness, and sleepiness.  (R. 19.)  The ALJ found that Plaintiff's impairments could reasonably cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects were not consistent with the medical evidence and other evidence in the record.  (R. 19.)

The ALJ identified medical evidence that was inconsistent with Plaintiff's claimed pain, fatigue, and limitations, specifically, infrequent documentation of trigger points and tender points, unremarkable radiological imaging, and physical examinations that documented only mild or minimal limitations and functional restrictions.  (R. 20.)  The ALJ also noted that prescribed treatment modalities—which included acupuncture, at-home exercises, back and knee braces, ibuprofen, injections, muscle relaxants, pain medication, pool and physical therapy, and weight loss—were relatively conservative. (R. 20.)  For example, the ALJ observed, Plaintiff's primary care physician remarked in January 2015 that Plaintiff's pain was controlled with Percocet, water exercise, and aqua therapy.  (R. 21.)  The ALJ emphasized the repeated advice from Plaintiff's medical providers to engage in pool therapy progressing to land therapy and to maintain an at-home exercise program, because those would provide the greatest symptom relief.

(R. 20–21.)  Yet the record revealed a pattern of poor compliance, which the ALJ documented in his decision.  (R. 21–22.)  The ALJ also observed that Plaintiff reported improvement with the prescribed treatments (particularly the back brace, pain medication, pool therapy, and a TENS unit), with walking, with daily exercise, and as the day progressed.  (R. 21.)  The ALJ concluded that Plaintiff's "course of treatment and the positive results she experienced from the treatment regimen [are] inconsistent with a finding of disability."  (R. 21.)

The ALJ specifically rejected Plaintiff's claim that she could not walk more than five minutes at a time as inconsistent with record evidence that she claimed to have lost a significant amount of weight on two occasions by walking more.  (R. 21.)  Logically, the ALJ reasoned, to lose weight by walking, one would have to walk more than five minutes at a time.  (R. 21.)  In addition, Plaintiff's ability to walk long and far enough to lose weight one year after knee injections in 2014 and radiofrequency ablation treatment for her back pain in 2015 indicated that those treatments were providing long-term relief.  (R. 21.)  The ALJ found this contradicted Plaintiff's testimony at the hearing that injections provided symptom relief for only a week.  (R. 21.)  Her testimony was also inconsistent with her other statements to medical providers in the record that injections provided 85% relief for six weeks and that injections had been beneficial for about three months.  (R. 21.)

As to Plaintiff's professed need for a cane, after a thorough review of the medical record, the ALJ discovered that Plaintiff's primary care physician prescribed the cane in 2011 at her request.  (R. 22.)  There was no contemporaneous evidence of an objective

medical need for the cane. (R. 22.) Three years later, Plaintiff asked for a prescription for a walker. (R. 22.) Her provider filled the request despite unremarkable clinical findings. (R. 22.) The ALJ pointed out a lack of medical evidence documenting any restrictions on ambulation or standing without a cane. (R. 22, 23.) The ALJ concluded that the evidence of record indicated that Plaintiff elected to use the assistive devices and they were not medically necessary. (R. 22.)

Concerning Plaintiff's carpal tunnel syndrome, the ALJ noted that Plaintiff was not compliant with wearing prescribed wrist braces at night in 2013. (R. 23.) The record contains very little evidence of carpal tunnel syndrome symptoms over the next year and a half, as the ALJ observed. (R. 24.) An EMG study in September 2014 revealed very mild to mild carpal tunnel syndrome and no evidence of radiculopathy. (R. 24.) The testing neurologist found the results "significantly improved" from testing in 2011. (R. 24.) Plaintiff and her treating physician agreed her symptoms had improved and no treatment other than splinting was needed. (R. 24.) The ALJ found the conservative treatment, effectiveness of the wrist braces, and imaging studies inconsistent with Plaintiff's claims that she could not button, snap, or grip clothing, and was limited to only occasional fingering and handling. (R. 24.)

The conservative treatment, effectiveness of the wrist braces, and imaging studies also belied a medical need for a PCA four hours a day. (R. 24.) The ALJ searched the record for daily notes from the PCA, who was Plaintiff's friend, but found none. (R. 24.) The PCA agency failed to provide the daily notes or timesheets at the ALJ's request. (R. 25.) Other records from the PCA agency revealed that services were provided based

8

on Plaintiff's self-reported needs, not objective observations. (R. 25.)

Regarding Plaintiff's claimed drowsiness, insomnia, and sleeplessness, the ALJ noted a sleep study diagnosis of mild positional sleep apnea and poor sleep hygiene. (R. 25.) The sleep specialist told Plaintiff to stop napping during the day, stop watching television in her bedroom at night, and leave her bedroom if she was not sleepy. (R. 25–26.) Medication was effective in aiding her sleep, and Plaintiff eventually stopped taking a sleep aid altogether. (R. 26.)

Turning to Plaintiff's mental impairments, the ALJ found that her panic attacks and depression were situational and exacerbated by her weight gain, her son's incarceration for murder, and having to care for at least four grandchildren after her son was incarcerated. (R. 26.) In addition, medication was generally effective in treating her panic and depression. (R. 26.) Claims of auditory hallucinations and delusional beliefs were sporadic, temporary, situational, treated conservatively, and alleviated by medication. (R. 16–17, 26.) Global Assessment of Functioning ("GAF") scores[4] were consistent with only mild limitations in functioning, and many mental status examinations were essentially normal. (R. 26.) Thus, the ALJ concluded, the objective medical evidence was inconsistent with Plaintiff's claimed subjective symptoms. (R. 26.)

Overall, the ALJ found inconsistencies among statements Plaintiff made to her

---

[4] "The GAF scale measures 'psychological, social, and occupational functioning' on a 1 to 100 scale." *Wright v. Colvin*, 789 F.3d 847, 855 n.4 (8th Cir. 2015) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994)). The GAF scale was omitted from the latest edition of the DSM. *See Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

medical providers. (R. 27.) For example, she reported to one provider that her symptoms prevented her from doing anything, but to another that she was getting out and walking more. (R. 27.) Plaintiff's answers and demeanor during a consultative psychological examination in late November 2012 were "completely inconsistent with her presentation at all other treating and examining medical and mental health providers." (R. 17.) For example, Plaintiff said that 2+2=6, that Martin Luther King was a United States president, and that she would not know what to do if she saw smoke or fire in a theater. (R. 17.) These answers were inconsistent with all other medical evidence and Plaintiff's educational background. (R. 17.) The inconsistencies in Plaintiff's statements to her providers indicated to the ALJ that her subjective complaints were not reliable. (R. 28.)

Plaintiff's failure to provide important information to her providers cast further doubt on the veracity of her claimed symptoms. (R. 28.) For instance, Plaintiff did not tell her treating psychiatrist about her chemical dependency history, and the DHS and public health nurses did not know she regularly cared for her grandchildren. (R. 28.) In light of "the numerous inconsistencies and unreliability of her subjective complaints, especially regarding the severity of her symptomatology and resulting limitations," the ALJ determined that the evidence of record was inconsistent with the extent of her claimed symptoms. (R. 28.)

The ALJ next considered Plaintiff's daily activities and found them inconsistent with the extent of her claimed symptoms. (R. 28.) Specifically, the ALJ found her alleged need for PCA services inconsistent with her ability to care for her grandchildren. (R. 28.) In addition, Plaintiff was able to prepare quick meals, run errands, shop, use a

computer, pay bills, and travel.  (R. 28.)  Earlier, in the step-three discussion, the ALJ also observed that Plaintiff was able to utilize Metro Mobility and taxis to run errands and go to medical appointments.  (R. 15.)  The ALJ found these activities inconsistent with the claimed severity and limiting effects of Plaintiff's symptoms.

As to the effectiveness of medications, Plaintiff's use of psychotropic medications was sporadic, and Seroquel and Effexor improved her symptoms.  (R. 26–27.)

The ALJ also considered Plaintiff's sporadic work record in evaluating her subjective complaints.  (R. 28.)  Plaintiff worked only intermittently since 1983, had a long history of multiple employers per year, and only twice earned more than $10,000 a year in thirty years of employment history.  (R. 28.)  There is no record of Plaintiff looking for employment or furthering her education after 2012.  (R. 28.)  Moreover, the ALJ found, Plaintiff's receipt of financial assistance "may have created an element of economic disincentive that prevents the claimant from searching for and obtaining full-time employment."  (R. 28–29.)

### 3.  Discussion

Plaintiff contends generally that the ALJ did not give good reasons for discounting her statements regarding her physical and mental impairments.  (Pl.'s Mem. Supp. Mot. Summ. J. at 36.)  To the contrary, as recounted above, the ALJ explained in great detail why he discounted each of Plaintiff's statements and provided ample record support for his findings.

Plaintiff next submits the ALJ improperly characterized her mental status examinations as "normal" and gave undue weight to certain GAF scores in the record.

(Pl.'s Mem. Supp. Mot. Summ. J. at 37.)  But many mental status examinations did contain objective "normal" findings (*e.g.,* R. 729–30, 2044, 2046, 2048, 2056, 2578–79, 2611), and thus the ALJ did not err in characterizing them as such.  Similarly, several GAF scores of record indicated only mild or moderate symptoms or difficulty in functioning (*e.g.*, R. 730, 2046, 2058), which were inconsistent with the extent of Plaintiff's claimed symptoms, as the ALJ found.

Plaintiff next contends an ALJ may not reject allegations solely because they are inconsistent with objective medical evidence.  (Pl.'s Mem. Supp. Mot. Summ. J. at 37.) It is true that an ALJ may not reject a claimant's subjective statements *solely* for lack of objective medical support, *see Halverson v. Astrue*, 600 F.3d 922, 931–32 (8th Cir. 2010), but the ALJ did not do so here.  The ALJ thoroughly considered Plaintiff's prior work history, daily activities, medications, functional restrictions, and precipitating and aggravating factors.  Moreover, it is well-established that an ALJ may consider the objective medical evidence as one factor in the subjective symptom assessment.  *Id.*; SSR 16-3p.

Plaintiff also faults the ALJ for making a "conclusory finding" that her daily activities were inconsistent with her claimed symptoms.  (Pl.'s Mem. Supp. Mot. Summ. J. at 37.)  The ALJ's consideration of Plaintiff's activities was far from conclusory, however.  The ALJ considered Plaintiff's ongoing care for her grandchildren and abilities to prepare meals, run errands, shop, use a computer, pay bills, travel, and utilize Metro Mobility and taxis to run errands and go to medical appointments.  (R. 15.)  An ALJ may properly consider such activities in assessing the severity and limiting effects of a

claimant's symptoms. *See Edwards v. Barnhart*, 314 F.3d 964, 965–66 (8th Cir. 2003). The ALJ did not err in finding Plaintiff's daily activities inconsistent with her claimed symptoms.

Next, Plaintiff challenges the ALJ's finding that she received conservative treatment for some of her conditions and the ALJ's consideration of Plaintiff's reports of improvement to her providers. (Pl.'s Mem. Supp. Mot. Summ. J. at 37.) Specifically, Plaintiff argues that steroid injections are not a conservative treatment, citing *Garrison v. Colvin*, 759 F.3d 995, 1015 n.20 (9th Cir. 2014.) But the injections discussed in *Garrison* were "epidural steroid shots to the neck and lower back," *id.*, not the intramuscular trigger point injections Plaintiff received. Moreover, the Ninth Circuit in *Garrison* merely "doubt[ed]" that the injections were conservative treatments. The Eighth Circuit, on the other hand, has described steroid injections as conservative treatment. *See Martise v. Astrue*, 641 F.3d 909, 915 (8th Cir. 2011); *accord Gay v. Berryhill*, No. 1:16-CV-00104 JTK, 2017 WL 4767784, at *2 (E.D. Ark. Oct. 20, 2017); *Bernal v. Colvin*, No. 1:14-CV-80 CEJ, 2015 WL 4746987, at *32 (E.D. Mo. Aug. 11, 2015).

As to the ALJ's citation to treatment records reflecting Plaintiff's reports of improvement to her providers, Plaintiff does not explain why such treatment records should not have been considered by the ALJ in evaluating her subjective symptoms. Rather, Plaintiff argues that such records must be viewed in light of the overall record, which, as recounted in Part III.A.2 above, the ALJ did here. Plaintiff also argues that reported improvements do not mean she could sustain competitive employment, but this

argument exceeds the context of the subjective symptom assessment. That is, the ALJ did not conclude that the reported improvements meant Plaintiff could work competitively, only that the reported improvements were inconsistent with Plaintiff's claimed symptoms.

Plaintiff next suggests she underwent brain surgery as a treatment for her mental condition. (Pl.'s Mem. Supp. Mot. Summ. J. at 38.) This assertion is not supported by the record. Similarly, Plaintiff argues that her prescribed medications (Zoloft, Trazodone, Seroquel, and Xanax) have risks of serious side effects such as tardive dyskinesia (Pl.'s Mem. Supp. Mot. Summ. J. at 38), but there is no evidence that Plaintiff suffered from that side effect or a similarly serious side effect.

Next, Plaintiff challenges the ALJ's finding that her statements were inconsistent, particularly her testimony that she could not walk longer than five minutes, and that injections provided relief for only a week. (Pl.'s Mem. Supp. Mot. Summ. J. at 39.) The ALJ did not reject Plaintiff's claim that she could not walk more than five minutes based only on her weight loss, however. The ALJ also identified evidence that Plaintiff told a medical provider she could walk "long distances" with the aid of a walker. (R. 2382.) That provider's contemporaneous treatment note reflects minimal musculoskeletal pain, mild bilateral sacroiliac tenderness, and increased lumbar range of motion. (R. 2383.) The treatment note also includes Plaintiff's report that her pain was improving, that her pain was a six on a ten-point scale, and that injections had been helpful and improved her low back pain and range of motion. (R. 2382.) This evidence is inconsistent with Plaintiff's testimony that she could not walk more than five minutes.

Other substantial evidence of record is also inconsistent with Plaintiff's statement that she cannot walk for more than five minutes. Specifically, a pain management evaluation in January 2013 revealed mostly normal neurological and musculoskeletal findings, normal strength in all extremities, normal joints, normal range of motion, and normal spine inspection, though spinal range of motion was painful and restricted. (R. 850–52.) In April 2013, Plaintiff reported to a provider that her arthritis and back pain (to which she attributed her limited ability to walk) were stable and controlled by medication. (R. 117, 950.) Plaintiff told a physical therapist in October 2013 that she could walk up to ten minutes at a time. (R. 988.)

As to Plaintiff's hearing testimony concerning the efficacy of injections, Plaintiff testified that trigger point injections provided relief "temporarily" for "weeks" (R. 87), but the ALJ remembered her testimony as claiming only a week of symptom relief (R. 21). The ALJ found the testimony inconsistent with Plaintiff's statements to her providers and other record evidence that injections were effective for much longer. (R. 21, 936, 943, 1078, 1735, 1879, 2384, 2603.) Plaintiff takes issue with the ALJ's finding that her testimony was inconsistent with her statements to providers. To the extent the ALJ remembered Plaintiff as testifying that injections were effective only for a week, any such error is harmless in light of the many other inconsistencies identified by the ALJ. To the extent the ALJ took into account Plaintiff's reports to her providers that the injections provided effective pain relief, the ALJ did not err in finding these reports inconsistent with the extent and limiting effects of symptoms she claimed.

Plaintiff next argues the ALJ erred by finding she did not medically require a cane

to walk.  (Pl.'s Mem. Supp. Summ. J. at 39.)  Plaintiff testified at the hearing that she

could not walk without a cane or a walker and that she had been prescribed the cane and

walker.  (R. 81, 117.)  While it is true that several providers noted that Plaintiff used a

cane or walker (R. 914, 2383, 2573), Plaintiff has identified no evidence in the record

establishing that a cane or walker was medically necessary.  The ALJ noted that

Plaintiff's treating physician ordered a cane for her in July 2011 because she requested

one.  (R. 22, 698–99.)  There were no corresponding findings that Plaintiff was

experiencing difficulty with ambulation, balance, or coordination, as the ALJ observed.

(R. 22, 698–99.)  Contemporaneous findings by another physician revealed only mild

tenderness in the knees with no significant swelling or laxity, and minimal tender point

tenderness.  (R. 696.)  These findings are not consistent with a medical necessity for a

cane.  A progress note from November 2014 reflected that Plaintiff had forgotten her

cane that day and was able to walk, albeit with a slow and stooped gait.  (R. 2611.)

Similarly, nurse practitioner Christa Jensen and Dr. David Nelson, to whom Plaintiff was

referred for a pain management evaluation, made no mention of a cane in their report of

January 22, 2013, and described Plaintiff's gait as normal, though slow.  (R. 848, 850,

852.)

        The ALJ summarized other substantial evidence of record that also supported his

determination that Plaintiff elected to use the cane and walker and that they were not

medically necessary.  (R. 22.)  Finally, it is worth noting that the ALJ did not entirely

reject Plaintiff's claimed need to use assistive devices.  The ALJ limited her to occasional

use of stairs and ramps, excluded balancing and walking on uneven surfaces, restricted

her to a sit/stand option, and allowed for the use of an assistive device if she had to walk more than fifty feet. (R. 22.)

Finally, Plaintiff takes issue with the ALJ's consideration of her work history, arguing that an ALJ is "not permitted to discount a claimant's subjective statements based on evidence that may reflect an individual's character, such as a poor work history . . . ." (Pl.'s Mem. Supp. Mot. Summ. J. at 39.) To the contrary, 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) explicitly authorize the ALJ to consider a claimant's prior work record when evaluating the intensity and persistence of symptoms. The Eighth Circuit has recently confirmed that a claimant's work history remains germane to an ALJ's evaluation of a claimant's subjective complaints. *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017).

In sum, substantial evidence supports the ALJ's evaluation of the intensity, persistence, and limiting effects of Plaintiff's symptoms.

### B. The ALJ's Consideration of Medical Opinion Evidence

Plaintiff argues the ALJ erred by giving little weight to Dr. Molony's December 2014 opinion about her physical limitations; little weight to Dr. Langsten's opinion about her mental impairments; little weight to the November 2012 opinion of consultative psychological examiner Dr. Donald Wiger; and great weight to Dr. Steiner's testimony.

#### 1. Legal Standards

A treating source's opinion on the nature and severity of a claimed impairment is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial

evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see* 20 C.F.R.

§ 416.927(c)(2). Correspondingly, an ALJ need not give controlling weight to an opinion

that is not well-supported by clinical findings or laboratory techniques or is inconsistent

with other substantial evidence. *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009).

If the opinion of a treating source is not afforded controlling weight, the ALJ must

consider the following factors in deciding what weight is due: (1) the existence of an

examining relationship; (2) the nature of the treatment relationship, such as length of

treatment and frequency of examination; (3) the degree to which the opinion is supported

by medical evidence such as medical signs and laboratory findings; (4) consistency with

the record; (5) the source's specialty; and (6) any other relevant factors. 20 C.F.R.

§§ 404.1527(c), 416.927(c). The ALJ is not required to explicitly discuss each and every

factor, as long as he or she considers all the factors and gives good reasons for the weight

assigned. *See Combs v. Colvin*, No. 8:12-cv-429, 2014 WL 584741, at *11 (D. Neb.

Feb. 12, 2014); *Derda v. Astrue*, No. 4:09-cv-1847 AGF, 2011 WL 1304909, at *10

(E.D. Mo. Mar. 31, 2011).

### 2.    Dr. Molony

Plaintiff began treating with rheumatologist Robert Molony, M.D., in August

2012. (R. 652–53.) In a Fibromyalgia Questionnaire dated December 24, 2014,

Dr. Molony listed diagnoses of fibromyalgia, osteoarthritis of the spine and knees,

obesity, and carpal tunnel syndrome. (R. 2271.) He opined that Plaintiff could only

occasionally lift up to ten pounds, sit for no more than two hours, and stand/walk for less

than an hour in an eight-hour workday. (R. 2274.) Dr. Molony further opined that

Plaintiff would need to get up from a seated position and move around for 10 minutes every hour, rest for 30 to 60 minutes every 2 hours, and would miss work more than 3 times a month.  (R. 2274, 2275.)  In addition, Dr. Molony indicated, Plaintiff would never be able to reach with her arms and could perform hand and wrist movements only occasionally.  (R. 2274.)

The ALJ gave little weight to Dr. Molony's December 2014 opinion, because the evidence did not support findings that Plaintiff could work only part-time and would be limited to less than a sedentary RFC.  (R. 30.)  The ALJ also found the opinion inconsistent with objective clinical findings, which documented few actual abnormalities and functional limitations.  (R. 30.)  Finally, the ALJ reduced the weight given to the opinion because Dr. Molony based his opinion on Plaintiff's subjective complaints, which the ALJ properly found were overstated, as discussed above.

In an earlier part of the decision, the ALJ noted that Plaintiff's providers "largely based her diagnosis of fibromyalgia on her general reports of widespread pain" and that the "providers rarely document the claimant having positive trigger and/or tender points though it is necessary to support a diagnosis of fibromyalgia."  (R. 20.)  The few times Plaintiff's providers did mention trigger or tender points, the ALJ remarked, they made comments such as "her tender point tenderness today is not very impressive."  (R. 20.)

Plaintiff first argues that the ALJ mischaracterized the record in finding that Dr. Molony based his December 2014 opinion on Plaintiff's complaints rather than objective clinical findings.  (Pl.'s Mem. Supp. Mot. Summ. J. at 26.)  But in the next sentence of Plaintiff's memorandum, she concedes that Dr. Molony based his opinion on

"evidence of widespread pain." (*Id.*)  Pain is a subjective symptom, *see Ford v. Astrue*, 518 F.3d 979, 982 (2008), and cannot be measured objectively.  Granted, subjective complaints of pain are fundamental to a fibromyalgia diagnosis, but the objective medical evidence of fibromyalgia consists of consistent tender point findings.  *See Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1, 678 (8th Cir. 2003).[5]

The ALJ's finding that Dr. Molony's December 2014 opinion was inconsistent with objective clinical findings is supported by substantial evidence of record.  Although there is objective evidence of tenderness (R. 655, 792), the findings do not correspond with the significant, long-term limitations on lifting, sitting, standing, walking, resting, and working opined by Dr. Molony.  For example, on December 7, 2012, Dr. Molony recorded tenderness in all tender points, but his recommendation to continue with a conservative approach and no imposition of functional or work restrictions indicates that the tenderness was mild and manageable.  (R. 792–93.)  Merely because some tenderness

---

[5]  The Eighth Circuit described fibromyalgia in *Brosnahan* as:

> inflammation of the fibrous and connective tissue, causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue.  Diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests.  According to the ACR's 1990 standards, fibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points.  Treatments for fibromyalgia include cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories.

336 F.3d at 672 n.1 (citing Jeffrey Larson, Fibromyalgia, in 2 *The Gale Encyclopedia of Medicine* 1326–27 (2d ed. 2002)).

is observed does not equate to finding that the claimant is unable to sustain competitive employment. Dr. Molony administered a corticosteroid injection that day in the most tender point area. (R. 793.) Plaintiff later reported that the injection had been effective for six weeks. (R. 936.)

In March 2013, Dr. Molony found tenderness in all points, but described only the mid-trapezius tender point as significantly tender. (R. 539.) Plaintiff requested an injection in that area, and reported improvement immediately afterward. (R. 939.) In August 2013 and April 2014, Dr. Molony documented tender point tenderness but did not note or recommend any corresponding limitations. (R. 1045, 1769.) In fact, in April 2014, Dr. Molony wrote he would not recommend any further medications but would recommend a "gradual conditioning approach." (R. 1769.) Dr. Molony also noted no significant joint swelling or warmth. After receiving injections in several trigger points that month, Plaintiff reported immediate improvement in pain. (R. 1734–35.) In October 2014, Dr. Molony wrote that Plaintiff's "tender points tenderness today is not very impressive." (R. 2182.) Two months later, he found tender point tenderness, but no swelling or warmth, only slightly decreased range of motion, and full motor strength in the upper and lower extremities. (R. 2460.) His treatment plan included weaning her off narcotic medications and corticosteroid injections and treating her pain with aerobic conditioning and better quality sleep. (R. 2461.)

In sum, there is no dispute that the objective medical record contains some evidence of tender and painful tender points. The ALJ credited this evidence when he acknowledged a diagnosis of fibromyalgia and accepted it as a severe impairment. But

the medical record does not contain objective clinical findings that would support the significant limitations on lifting, sitting, standing, walking, resting, reaching, and absenteeism opined by Dr. Molony. Consequently, the ALJ did not err in declining to give Dr. Molony's opinion controlling weight.

Plaintiff next asserts that even if Dr. Molony's opinion were not entitled to controlling weight, the ALJ should have given it great weight because Dr. Molony is a board-certified rheumatologist, had a long treatment relationship with Plaintiff, treated Plaintiff for fibromyalgia, and provided support for his opinion. The ALJ did, in fact, take note of Dr. Molony's specialty and treatment relationship with Plaintiff. (R. 29.) And, as discussed above, the ALJ discussed how the limitations set forth in Dr. Molony's opinion were not supported by medical signs and laboratory findings and were not consistent with the record. The Court finds that the ALJ considered the relevant factors for weighing medical opinion evidence and gave good reasons for assigning little weight to Dr. Molony's December 2014 opinion.

As a final matter, the Court observes that Dr. Molony's December 2014 opinion was rendered on a check-the-box form. The Eighth Circuit Court of Appeals recently decried the use of such forms in *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018). Like the form used in *Thomas*, the questionnaire completed by Dr. Molony "consist[ed] of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses." *Id.* The assessment recounted no medical evidence and provided no elaboration, and thus possesses "little evidentiary value." *Id.* (quoting *Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014)). An ALJ may give little weight to

the opinion of a treating provider on that basis alone. *Id.*

### 3. Dr. Langsten

Dr. Nels Langsten, a board-certified psychiatrist, began treating Plaintiff for depression and insomnia in September 2013. (R. 1023.) Most of his progress notes are handwritten and illegible, as Plaintiff concedes. (Pl.'s Mem. Supp. Mot. Summ. J. at 17.) The notes are also very short, typically consisting of about three lines of text. The legible words primarily summarize Plaintiff's reported physical impairments and her son's legal troubles. (*E.g.*, R. 2621–37.) Dr. Langsten prescribed Xanax and Ambien to Plaintiff. (R. 2648.)

In the mental status exam section of a psychiatric evaluation dated April 6, 2014, Dr. Langsten described Plaintiff as cooperative, neat, appropriately dressed, fully oriented, coherent, and with intact memory, recall, and other cognitive functions. (R. 1025.) Her mood was "quite anxious and at times depressed," but her affect was generally appropriate and she had no suicidal thoughts or ideation. (R. 1025.) Her insight and judgment were intact. (R. 1025.) Plaintiff reported episodic auditory hallucinations in the form of the voice of a friend who had been shot and killed in a drive-by shooting. (R. 1025.) Plaintiff had also been shot in the upper right arm in that incident. (R. 1023.) Dr. Langsten noted diagnoses of posttraumatic stress disorder with anxiety, depression, and psychotic features; and a history of being diagnosed with anxiety and depression. (R. 1025.) Dr. Langsten opined that Plaintiff was "totally disabled because of her psychiatric disorder and is unable to be gainfully employed in the foreseeable future." (R. 1025.)

On February 26, 2015, Dr. Langsten completed a Mental Impairment Questionnaire in which he described Plaintiff's signs and symptoms as a depressed mood, persistent or generalized anxiety, motor tension, intrusive recollections of a traumatic experience, and sleep disturbances. (R. 2619.)[6] Of those symptoms, he indicated that anxiety and insomnia were the most severe. (R. 2620.) Of a list of more than twenty possible mental limitations, Dr. Langsten did not indicate any as marked, and only four as "moderate-to-marked." (R. 2621.) Dr. Langsten opined that Plaintiff's impairments would cause her to miss work more than three times a month. (R. 2622.) When asked to provide clinical findings to support his assessment, Dr. Langsten wrote, "Anxious mood, intrusive memories of past traumatic events, intermittent depressed mood." (R. 2620.) He gave her a GAF score of 40. (R. 2618.)

In assessing Dr. Langsten's evidence, the ALJ noted the brevity of his notes and the lack of evidence concerning Plaintiff's mental status and functioning. (R. 27.) When Dr. Langsten did mention Plaintiff's mental status, the ALJ observed, he generally stated it was stable or slightly improved, with less depression, and situational or episodic anxiety. (R. 27.) Dr. Langsten never documented any actual mental status exam findings. (R. 27.) The ALJ placed little weight on Dr. Langsten's opinion that Plaintiff was totally disabled and unable to work for lack of objective medical support, particularly

---

[6] Dr. Langsten's opinion appears twice in the record: once at R. 1118–22 and again at R. 2618–22. The latter opinion is clearly a photocopy of the first, and the only difference between them is the signature dates. The first opinion was signed on February 26, 2013, and the second was signed on February 26, 2015. The first opinion was clearly dated in error, as Dr. Langsten had not yet begun treating Plaintiff in February 2013. Thus, the Court cites to the second, correctly-dated opinion.

unremarkable mental status exams and GAF scores by other mental health providers. (R. 31.) The ALJ further discounted Dr. Langsten's opinions overall because the doctor relied on Plaintiff's subjective complaints rather than making objective clinical findings; made untrue comments such as that Plaintiff had no history of alcohol or drug abuse and that Plaintiff gained fifty pounds from Seroquel and Zoloft, which called into question how well he knew Plaintiff; based his opinions in part on Plaintiff's physical impairments, which he did not treat; and found that Plaintiff's concentration difficulties and depression were manifested by her inability to return to college, without taking into account the situational stressors of her son's incarceration and her childcare duties for her grandchildren. (R. 32–33.)

With particular respect to Dr. Langsten's February 2015 opinion, the ALJ found the GAF score of 40 inconsistent with Dr. Langsten's assessment that Plaintiff had no-to-moderate mental limitations in 18 to 23 of the assessed areas, and inconsistent with the doctor's own acknowledgment that Plaintiff had not required hospitalization. (R. 31–32.)[7] The ALJ also found the opinion overall inconsistent with Plaintiff's "essentially normal mental status exams and assessed GAF scores in the 58 to 70 range" documented by other providers. (R. 32.)

Plaintiff first argues that the ALJ "grossly mischaracterized the treatment record" in concluding that Dr. Langsten's February 2015 opinion was inconsistent with normal

---

[7] Though the ALJ referred to the questionnaire dated February 26, 2013, in his discussion, as explained in the preceding footnote, that opinion is identical to the questionnaire dated February 26, 2015. The ALJ's findings are therefore applicable to that opinion.

mental status examinations. (Pl.'s Mem. Supp. Mot. Summ. J. at 29; R. 32.) Plaintiff cites to treatment records noting subjective reports of a depressed, anxious, or angry mood; and objective findings of reduced eye contact, limited insight and judgment, poor attention/concentration, below average intelligence, guarded behavior, and slowed speech. (R. 730, 732, 818–19, 1044–45, 1028–29, 1092, 2056, 2611.) There is no question that Plaintiff experienced these symptoms to some degree and that her providers documented these findings in the record. But, as the ALJ determined, these findings do not support the degree of limitation opined by Dr. Langsten: that Plaintiff would be moderately to markedly limited in working in coordination with others without distraction, working without interruptions from psychological symptoms, performing at a consistent pace without unreasonable rest periods, and making plans independently. Nor do the objective findings support Dr. Langsten's opinion that Plaintiff would miss more than three days of work a month.

Moreover, there are many mental status examinations documenting cooperative behavior, normal speech, normal thought processes, logical and goal-directed thoughts, alertness, orientation to person and place, normal or fair attention/concentration, intact short-term and long-term memory, average intelligence, engaged demeanor, concrete abstraction, and adequate insight and judgment. (R. 730, 1028, 2046, 2058, 2561–62, 2578–79, 2611.) The ALJ did not err in finding these mental status examination findings inconsistent with Dr. Langsten's opinion.

Significantly, Dr. Langsten's February 2015 opinion was inconsistent with the findings in his own mental status examination in April 2014, conducted as part of a larger

psychiatric evaluation.  In the mental status examination section of the report, Langsten described Plaintiff as, *inter alia*, cooperative, fully oriented, and coherent, with a generally appropriate affect; and found that she demonstrated intact memory, recall, judgment, insight, and other cognitive functions.  (R. 1025.)

Plaintiff next submits the ALJ erred by finding Dr. Langsten's GAF score of 40 inconsistent with the record.  (Pl.'s Mem. Supp. Mot. Summ. J. at 31.)  The Court disagrees.  There is no dispute that other GAF scores in the record range from 58–70. (R. 730, 2046, 2058.) These scores indicate mild or moderate symptoms, whereas a score of 40 indicates major impairment in several areas.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. rev. 2000)).  Further, as discussed above, the objective medical evidence and clinical findings do not support a conclusion that Plaintiff experiences major impairment in functioning.

Plaintiff next challenges the ALJ's finding that Dr. Langsten's suggested limitations were inconsistent with her activities of daily living, citing case authority pertaining to whether a claimant's daily activities were inconsistent with complaints of disabling pain.  (Pl.'s Mem. Supp. Mot. Summ. J. at 32 (citing *Leckenby v. Astrue*, 487 F.3d 626, 634–635 (8th Cir. 2007); *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005); *Bauer v. Astrue*, 532 F.3d 606, 608–609 (7th Cir. 2008)).)  This authority is misplaced.  Whether Plaintiff's daily activities were inconsistent with Dr. Langsten's limitations is not the same question as whether her daily activities were inconsistent with her complaints of disabling pain.

Moreover, the ALJ properly determined that Plaintiff's daily activities,

particularly her childcare duties, were inconsistent with the severity and limiting effects

of her claimed symptoms.  Consequently, having appropriately determined that the nature

and extent of Plaintiff's symptoms were not as limiting or severe as she claimed, the ALJ

did not err in finding her daily activities inconsistent with the limitations suggested by

Dr. Langsten.

In sum, because Dr. Langsten's opinion was not supported by medically

acceptable clinical findings and was inconsistent with other substantial evidence in the

record, the ALJ did not err in declining to give it controlling weight.  In deciding what

weight to give the opinion, the ALJ took into account the existence and nature of the

treatment relationship and Dr. Langsten's specialty, but these factors were not as

significant as the lack of medical signs and clinical findings and the inconsistencies with

the record.  The Court is satisfied that the ALJ considered all of the relevant factors and

gave good reasons for the weight he assigned.

Finally, similar to Dr. Molony's opinion, Dr. Langsten's February 2015 opinion

was provided on a check-the-box form consisting of checked boxes and a few conclusory

statements.  The form cited no medical evidence and included no elaboration about

Plaintiff's mental condition or limitations.  Consequently, it has little evidentiary value

and the ALJ did not err in giving it little weight.

### 4.    Dr. Wiger

Dr. Donald Wiger, Ph.D., was a consultative psychologist who examined Plaintiff

in November 2012.  (R. 769.)  Dr. Wiger stated at the beginning of the written evaluation

the validity of the interview was questionable because of "attitudinal concerns" and

responses such as "I don't know" to even simple questions. (R. 769.) Plaintiff also refused to answer any questions about her daily schedule and told Dr. Wiger that 2+2=6, that Martin Luther King was a United States president, and that she would not know what to do if she saw smoke or fire in a theater. (R. 771.) Axis I of Dr. Wiger's diagnosis begins with the phrase "Non cooperation of client." (R. 771.)

The ALJ placed little weight on Dr. Wiger's opinion because it was clear that Plaintiff had not cooperated and put forth full effort during the examination. (R. 31.) In addition, her presentation and demeanor during the examination was atypical; she had never presented herself or acted similarly to a treating provider. (R. 31.) Finally, the ALJ found the opinion inconsistent with Plaintiff's mental status examinations. (R. 31.)

The Court finds that the ALJ did not err in giving little weight to Dr. Wiger's opinion. Though Dr. Wiger was a specialist and examined Plaintiff once, he had no treatment relationship with her. Dr. Wiger's opinion was not consistent with other substantial evidence of record. Most significant, however, were Dr. Wiger's indications that Plaintiff was not cooperating or putting forth her full effort. Indeed, Dr. Wiger's first diagnosis was non-cooperation. An ALJ has the duty to reconcile a consultative examiner's comment that a claimant failed to put forth full effort with the asserted validity of clinical findings. *Clay v. Barnhart*, 417 F.3d 922, 929–30 (8th Cir. 2005). When an opinion is equivocal in this manner, the ALJ does not err in giving it little weight. *Id.*

### 5. Dr. Steiner

Plaintiff argues that the ALJ erred in relying on Dr. Steiner's testimony because he

never examined her.  (Pl.'s Mem. at 26.)  An ALJ does not err in crediting the testimony of a non-examining medical expert over evidence from examining physicians, however, when the latter is not supported by objective clinical findings, does not include functional limitations, and is based mainly on the claimant's subjective complaints.  *Gates v. Astrue*, 627 F.3d 1080, 1082–83 (8th Cir. 2010) (citing *Janka v. Sec'y of Health, Educ. & Welfare*, 589 F.2d 365, 368 n.4 (8th Cir. 1978)).  The opinion of a non-examining medical expert such as Dr. Steiner, "even if different from that of an examining physician, may constitute substantial evidence to support a finding of nondisability." *Janka*, 589 F.2d at 368 n.4.

Plaintiff also finds fault with Dr. Steiner's testimony that "pain reports basically are a credibility issue" and that he based his testimony opinion on the objective medical evidence.  (R. 93.)  But Plaintiff disregards Dr. Steiner's previous testimony in which he acknowledged a diagnosis of fibromyalgia with generalized joint pain and tender points, and testified that pain due to fibromyalgia was Plaintiff's primary limiting condition. (R. 90, 92.)  Moreover, as the ALJ correctly determined, Plaintiff's reports of pain and other symptoms to her providers were exaggerated.  An ALJ may give less weight to an opinion based largely on overstated subjective complaints, *see Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007), and it stands to reason that an ALJ may give greater weight to an opinion that omits overstated subjective complaints.

### 6.    Non-Examining State Agency Psychologists

The ALJ did not specify the weight he gave to the opinions of non-examining state agency psychological consultants made at the initial and reconsideration determination

levels, but it is clear from the context of the ALJ's decision that he gave them great or significant weight. (R. 30.) Plaintiff contends the ALJ erred by giving greater weight to the opinions of the consultants than to Dr. Langsten's opinion. (Pl.'s Mem. Supp. Mot. Summ. J. at 33.)

The Court has already discussed Dr. Langsten's opinion and why the ALJ did not err in giving it little weight. When a treating physician's opinion is not entitled to significant weight, an ALJ may rely instead on an opinion from a non-examining medical source as long as the opinion is consistent with other medical evidence in the record. *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007).

Furthermore, non-treating, non-examining consultants "are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the [Social Security] Act." SSR 17-2p, 2017 WL 3928306, at *3 (S.S.A. Mar. 27, 2017). By statute, the ALJ may consider evidence from such sources as medical opinion evidence. 20 C.F.R. §§ 404.1527(e), 404.1513a(b), 416.927(e), 416.913a(b).

Here, the ALJ explained that he gave weight to the state agency psychological consultants' opinions because they provided specific reasons for their opinions and the opinions were supported by the evidence of record. The ALJ also determined that evidence received into the record subsequent to the opinions would not have altered the opinions. Consequently, the Court concludes the ALJ did not err in his consideration of the opinions of non-examining state agency psychological consultants.

### C.    Plaintiff's Letter of October 17, 2018

In a letter dated October 17, 2018, Plaintiff brought to the Court's attention a

recent Supreme Court case, *Lucia v. SEC*, 138 S. Ct. 2044, 2049 (2018), in which the Supreme Court determined that ALJs of the SEC are "Officers of the United States" and therefore subject to the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. (Pl.'s Letter [Doc. No. 23].) The relief ordered in *Lucia* was a new hearing before a properly appointed ALJ. 138 S. Ct. at 2055. Plaintiff submits that the ALJ who presided over her hearing was not properly appointed under the Appointments Clause and thus she is entitled to a new hearing. Plaintiff concedes she did not make this argument to the Social Security Administration.

The Commissioner responded that *Lucia* requires a "timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case." 138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 182–183 (2018)). Because Plaintiff did not raise her argument to the agency, the Commissioner asserts, her argument is waived.

The Eighth Circuit has concluded that a party forfeits an Appointments Clause claim by failing to raise it to the agency. *See NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013). Numerous district courts in the Eighth Circuit and nationwide have denied requests for remand made pursuant to *Lucia* on the ground that the plaintiff did not raise the Appointments Clause issue to the Social Security Administration. *E.g.*, *White v. Berryhill*, No. 18-cv-2005-LTS, 2019 WL 586757, at *15 (N.D. Iowa Feb. 13, 2019); *Catherine V. v. Berryhill*, No. 17-cv-3257 (DWF/LIB), 2019 WL 568349, at *2 (D. Minn. Feb. 12, 2019); *Axley v. Comm'r, Soc. Sec. Admin.*, No. 1:18-CV-1106-STA-CGC, 2019 WL 489998, at *2 (W.D. Tenn. Feb. 7, 2019); *Shipman*

*v. Berryhill*, No. 1:17-cv-00309-MR, 2019 WL 281313, at *3 (W.D.N.C. Jan. 22, 2019);

*A.T. v. Berryhill*, No. 17-4110-JWB, 2019 WL 184103, at *7 (D. Kan. Jan. 14, 2019);

*Page v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 902, 905–06 (E.D. Mich. Oct. 31, 2018).

Here, Plaintiff did not raise her Appointments Clause argument to the Social

Security Administration; thus, it is waived.

Accordingly, based on all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Plaintiff's Motion for Summary Judgment [Doc. No. 16] is **DENIED**; and

2.  Commissioner Nancy A. Berryhill's Motion for Summary Judgment [Doc. No. 19] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: February 15, 2019                    *s/ Hildy Bowbeer*
                                             HILDY BOWBEER
                                             United States Magistrate Judge